J-S01017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.S, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1070 WDA 2022 |

Appeal from the Order Entered August 22, 2022,
in the Court of Common Pleas of Allegheny County,
Civil Division at No(s):  CP-02-AP-0000030-2022.

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1071 WDA 2022 |

Appeal from the Order Entered August 22, 2022,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s):  CP-02-AP-0000029-2022.

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1072 WDA 2022 |

Appeal from the Order Entered August 22, 2022,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s): CP-02-AP-0000031-2022.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY KUNSELMAN, J.:               **FILED:  March 17, 2023**

In this consolidated matter, C.M. (Mother) appeals the orders entered by the Allegheny County Orphans' Court, which involuntarily terminated her rights to her three daughters, Z.S. (age 5), S.R.S. (age 4), and L.S. (age 22 months), pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(2), (5), (8); (b).[1]  After careful review, we affirm.

In its thorough Pa.R.A.P. 1925(a) opinion, the orphans' court set forth the following procedural and factual history:

> Z.S. was born [in January] 2017.  S.[R.]S. was born [in March] 2018.  In the summer of 2020, [the Allegheny County Office of Children, Youth, and Families (OCYF)] had some contact with the family regarding allegations of substance abuse by the parents and inadequate medical care for the Children.  It is unclear to the court whether the family was offered services at that time.  [In October 2020], OCYF received another referral because Mother tested positive for opiates and methadone at the time of L.S.'s birth.  Based upon L.S.'s neonatal exposure to methadone, she had to be admitted to the Newborn Intensive Care Unit (NICU) at Children's Hospital of Pittsburgh.  On October 4th, 2020, OCYF caseworkers met with the parents and Mother admitted to using heroin throughout her pregnancy.  OCYF referred Mother to the POWER [(Pennsylvania Organization for Women in Early Recovery)] Program to undergo a drug

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the rights of B.S. (Father), who did not appeal.

and alcohol evaluation. Mother completed a drug and alcohol assessment on October 5th, 2020 and was recommended to attend in-patient treatment. Shortly thereafter, Mother was admitted to UPMC McKeesport Hospital's Inpatient Rehabilitation program for a detox and in-patient treatment. On that same day, OCYF obtained an Emergency Custody Authorization (ECA) for Z.S. and S.[R.]S. and the Children were removed from their parent's care.

On October 20th, 2020, Z.S. and S.[R.]S. were placed in the foster home of [the Foster Family]. On October 21st, 2020, L.S. was released from the hospital. OCYF obtained an ECA on her that same day and she was also placed in [the same] foster home. On October 26th, 2020, Mother was successfully discharged from her inpatient treatment program at UPMC McKeesport. Mother was recommended to continue her treatment through an intensive outpatient program.

On November 17th, 2020, the court adjudicated the Children dependent. The Court ordered them to remain in placement with the [Foster Family]. Mother was ordered to engage in an appropriate level of drug and alcohol treatment, comply with random screens, attend a parenting program, and to attend the Children's medical appointments. Mother's visits were ordered to be supervised.

A Permanency Hearing was held on February 18th, 2021. The court ordered the Children to remain in placement with [the Foster Family]. Mother was found to be in minimal compliance and to have made minimal progress toward alleviating the circumstances which necessitated the original placement. The court ordered Mother to complete drug and alcohol treatment, attend random screens, and to attend a coached parenting program. The court found that Mother had been attending her methadone maintenance program but had not been attending random urine screens. During this reporting period, it was discovered that S.[R.]S. had twenty-three cavities. S.[R.]S. had dental surgery on March 30th, 2021, to address the cavities.

A Permanency Hearing was held on May 13th, 2021. The court ordered the Children to remain in their placement with the [Foster Family]. The court found that Mother had made

minimal compliance. During this reporting period, Mother attended most of the Children's medical and service provider appointments but was not engaged in an appropriate level of drug and alcohol treatment. The court ordered Mother to attend drug and alcohol treatment, to sign releases, to submit to random urine screens, and to participate in coached visitation. Mother's visits were ordered to remain supervised with permission to increase the frequency at the agreement of all parties. Mother began coached visitation in April of 2021.

A Permanency Hearing was held on August 25th, 2021. The court ordered the Children to remain in placement with the [Foster Family]. The court found Mother to be minimally compliant and to have made minimal progress. During this reporting period, Mother had been compliant with her methadone maintenance program, had undergone an intake for intensive outpatient program and attended some of the Children's medical appointments.

Mother completed a POWER interview on November 15th 2021. She was referred to Pathway to Care and Recovery for a full drug and alcohol assessment. A Permanency Hearing was held on November 18th, 2021. The court ordered the Children to remain in the placement of the [Foster Family]. The court found that Mother was moderately compliant but had only made minimal progress. Mother was compliant with her methadone maintenance program but was not participating in intensive outpatient treatment. During this reporting period, Mother had not attended any of the Children's medical appointments but was participating in coached visitation. The court ordered the parents to submit to urine screens and appointed the foster parents as secondary medical and educational decision-makers.

A Permanency Hearing was held on March 2nd, 2022. The court ordered the Children to remain in their placement with the [Foster Family]. The court found Mother to be in minimal compliance and to have made minimal progress. During this reporting period, Mother was attending her methadone maintenance program but was not in intensive outpatient treatment. She also had not competed any random urine screens and had not attended any medical or behavioral appointments for the Children. OCYF filed the

termination petitions on March 21, 2022. Mother underwent a POWER evaluation on April 12th, 2022 and was recommended for outpatient treatment. Mother also submitted a urine screen, the evaluation, and the results were indicative of relapse.

Dr. Patricia Pepe was the court-ordered psychologist assigned to evaluate the family for the Dependency and Termination matters. As part of the evaluation process, Mother was expected to undergo an individual psychological evaluation and an interactional evaluation with the Children. Mother failed to appear for an individual evaluation on April 20th, May 19th, and June 8th of 2022. During Mother's interactional evaluation on May 24th, 2022, Dr. Pepe reported that Mother positively engaged with the Children and had a good understanding of each of the Children's developmental functioning. Dr. Pepe opined that Mother exhibited positive and appropriate parenting skills. However, Dr. Pepe expressed concerns over Mother's inability to meet her court-ordered goals and what appeared to be an "eleventh hour" attempt to gain compliance. Dr. Pepe found this troubling as the Children had been in care for eighteen months.

Dr. Pepe also conducted an interactional evaluation with the Children and the Foster Parents. Dr. Pepe reported that the Children were thriving in their foster home and appeared to be receiving excellent care. She further opined that the Children exhibited multiple bonding behaviors suggestive of positive and primary attachment toward the Foster Parents. Dr. Pepe concluded that the Children had developed a primary attachment to their Foster Parents and perceived them as their primary and psychological parents.

Trial Court Opinion, 10/14/22 (T.C.O.) at 2-6 (citations to the record omitted).

The orphans' court granted the termination petitions on August 12, 2022. The court terminated Mother's rights to each respective Child under the same grounds – 23 Pa.C.S.A. § 2511 (a)(2), (5), (8), and (b). Mother

timely filed these appeals. She has submitted a consolidated Brief, presenting the following issues for our review:

> 1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 (a)(2), (5) and (8)?
>
> 2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Child[ren] pursuant to 23 Pa.C.S.A. § 2511 (b)?

Mother's Brief at 10.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*,

265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re*

***C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of***

***Adoption Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Critically, we may uphold a termination decision if any proper basis

exists for the result reached. ***C.S.***, 761 A.2d at 1201.  We need only agree

with the orphans' court as to any one subsection of Section 2511(a), as well

as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.

Super. 2004) (*en banc*).

Therefore, we review Mother's first appellate issue insofar as it concerns

the termination of her rights under Section 2511(a)(2), which provides:

> **(a) General rule.--**The rights of a parent in regard to a
> child may be terminated after a petition filed on any of the
> following grounds:
>
> [...]
>
> (2) The repeated and continued incapacity, abuse, neglect
> or refusal of the parent has caused the child to be without
> essential parental care, control or subsistence necessary for
> his physical or mental well-being and the conditions and
> causes of the incapacity, abuse, neglect or refusal cannot or
> will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party

must prove "(1) repeated and continued incapacity, abuse, neglect or refusal;

(2) that such incapacity, abuse, neglect or refusal caused the child to be

without essential parental care, control or subsistence; and (3) that the causes

of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019) (citation omitted).

Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). We note that the grounds for termination are not limited to affirmative misconduct like abuse but concern parental incapacity that cannot be remedied. *See id.*

Instantly, Mother concedes that OCYF established the first two elements of the Section 2511(a)(2) inquiry. She recognizes that her substance abuse rendered her incapable of providing the Children with parental care. However, Mother maintains OCYF failed to provide the third element – that the cause of the incapacity cannot or will not be remedied. She cites her consistent methadone treatment and her compliance with the other aspects of her family service plan, including parenting and visitation goals. *See* Mother's Brief at 27. She argues that she is in a better place in her life, and that it was an abuse of discretion for the orphans' court to find that the conditions that led to removal have yet to be remedied. *Id.* at 27-28.

Mother displayed varying levels of compliance with the reunification plan. The record of the permanency reviews indicated that Mother was, at times, fairly consistent when it came to participation in parenting programs, the Children's medical care, and visitations. It bears noting, however, that the orphans' court concluded that Mother was minimally compliant with her reunification plan as a whole. In any event, as Mother and the orphans' court recognize, this case was first and foremost about Mother's drug use. On that point, the orphans' court found:

Mother's substance abuse was the most significant concern for the family and the reason the Children were removed from her care. As such, drug and alcohol treatment has been a long-standing goal for Mother. As a part of this goal, she was expected to obtain sobriety, to follow through with drug and alcohol treatment, to continue medication assisted treatment of her methadone program, to submit to random screens and to sign releases of information. Mother has struggled with nearly every expectation contained within this goal except for her methadone maintenance program.

> FN 1: It should be noted that OCYF was unable to confirm Mother's consistent participation in a methadone maintenance program. However, the court recognizes that many of these programs are not responsive to OCYF's requests for records or compliance reports.

Mother has not been in [an] appropriate level of drug and alcohol treatment outside the roughly two weeks she spent at UPMC McKeesport's inpatient detox program in 2020. Upon her release from this program, she was recommended for intensive outpatient treatment. Mother has not followed through with this recommendation since it was made nearly two years ago. Mother reported to OCYF that she has been diagnosed with [Chronic Obstructive Pulmonary Disease (COPD)] and identified it as a barrier for complying with her drug and alcohol treatment goals. Despite several requests from the OCYF caseworker, Mother never provided the agency with confirmation of this diagnosis. The court did not find Mother's claims of poor health to be a legitimate barrier to her participation in drug and alcohol treatment goals. Mother chose not to engage in the appropriate level of drug and alcohol treatment for nearly two years despite it being court ordered after every single Permanency Hearing.

Mother has not submitted to a single urine screen for OCYF during the pendency of the case, despite being called in thirty-four times. Mother did appear at the Allegheny Health Department's Drug Screening Office five times but was unable to provide a urine sample. Mother reported that she was physically unable to produce a urine sample while in the presence of a female drug screener at the Health Department. However, she was able to produce a sample at her methadone clinic and at POWER. Mother reported

- 10 -

that the method of screening at these locations was different than at the Health Department. The Court did not find this to be a plausible explanation. Mother has been unable to substantiate her claims that she was living a drug free lifestyle. As recently as April of 2022, Mother provided a urine sample for POWER that was indicative of relapse. For these reasons, the court finds that Mother did not satisfactorily complete her drug and alcohol treatment goal.

T.C.O. at 9-11 (citations to the record omitted) (footnote original).

Upon review, we conclude that the record supports the orphans' court determination that Mother was unable or unwilling to remedy her substance abuse. Initially, we observe that a parent's prolonged use of a prescribed addiction medication does not necessarily mean the parent is unable or unwilling to remedy the substance abuse issues that led to the child's removal. If this sort of prolonged, but prescribed, treatment continues to be essential, courts should not construe the need for such treatment to be an automatic bar to reunification. Although the courts may infer that the parent's fragile recovery poses safety concerns, the ultimate question is whether ingestion of such medication renders the parent unable to provide essential parental care. If a parent can provide proper care, notwithstanding the continued use an addiction treatment drug, then it would appear that the third element of Section 2511(a)(2) would be not be established.

But that is not the case here. First, as the orphans' court noted, Mother did not provide confirmation that she was consistent with her methadone treatment program. We appreciate the candor of orphans' court Footnote 1, which articulated the bureaucratic difficulty that OCYF ran into when trying to

- 11 -

obtain reports from the clinic. While parents have an obligation to demonstrate their compliance with their reunification plan, we remind the Agency that it has the ultimate burden of proving termination. We expect the Agency to work with parents to overcome these bureaucratic difficulties, given that a dependency cases typically last for many months. That said, this case does not turn on whether Mother was consistent in a monitored methadone treatment program.

Instead, the orphans' court determined that Mother's failure to provide drug screens was significant. Without such screens, the court could not ensure that Mother was able to remedy her substance abuse issues and provide essential care. Indeed, the one screen Mother did provide, late in the dependency case, indicated that Mother had relapsed.[2] The record also indicated that Mother had used methadone **and** opiates around the time of the L.S.'s birth. Thus, to the extent that Mother maintained a methadone regiment, it does not mean that Mother was otherwise drug-free.

Regarding Mother's missed drug screens, the orphans' court was not persuaded by Mother's excuse that she had COPD.[3] But even assuming

---

[2] Confidentiality regulations prohibited the POWER witness from revealing what drug Mother tested positive for; however, a positive test for methadone would not constitute a relapse. **See** N.T., at 9; 18.

[3] As to whether Mother actually had COPD, our review is impeded by the lack of documentation. On one hand, if Mother seeks to raise her condition as a defense, she must provide documentation of the same. On the other hand, when the goal is reunification, the Agency must make reasonable efforts to
*(Footnote Continued Next Page)*

Mother had COPD, such an ailment does not excuse her failure to provide screens. Perhaps if Mother missed a small number of screens due to COPD complications, we might find such an excuse reasonable. But Mother did not provide a single drug screen until the end of the dependency proceedings. Moreover, parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Z.P.*, 994 A.2d at 1117. The Children were in placement for approximately 23 months. If Mother had physical difficulty complying with the screens, due to COPD, then special accommodations could have been made. Evidently, Mother never brought the matter to the attention of the court. The orphans' court did not err when it made a negative inference from Mother's missed drug screens.

In sum, the record supports the court's determination that Mother was unable or unwilling to remedy her substance abuse issues, because: she did not provide screens indicating that she was negative for drugs besides her prescribed methadone; and because she evinced a possible relapse; and to a lesser degree, because she could not verify her consistent participation in the methadone program. Thus, the court did not err or abuse its discretion when

---

overcome these types of obstacles. Although Mother signed some releases, the record is unclear whether Mother signed a release enabling OCYF to find out Mother's exact medical history.

We emphasis this point, because it exemplifies the problem courts encounter during dependency and termination proceedings. Ascertaining the best interests of the child is difficult enough without that decision turning on whether a party followed through with important paperwork.

it determined that OCYF established grounds for termination under Section 2511(a)(2).

Having discerned no error or abuse of discretion as to the first prong of the bifurcated termination analysis, we next address the orphans' court's findings under Section 2511(b), which Mother challenges in her second appellate issue.

The section provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained further:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer

- 14 -

that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63
(Pa. Super. 2008). Accordingly, the extent of the bond-
effect analysis necessarily depends on the circumstances of
the particular case. ***Id.*** at 763.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists,

but whether termination would destroy this existing, necessary and beneficial

relationship. ***See C.M.K.***, 203 A.2d at 264 (citation omitted); ***see also K.Z.S.***,

946 A.2d at 764 (holding there was no bond worth preserving where the child

had been in foster care for most of the child's life, which caused the resulting

bond to be too attenuated). Moreover, the court is not required to use expert

testimony to resolve the bond analysis. ***In re Z.P.***, 994 A.2d 1108, 1121

(citing ***In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008)).

"Common sense dictates that courts considering termination must also

consider whether the children are in a pre-adoptive home and whether they

have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268. Finally, we

emphasize that "[w]hile a parent's emotional bond with her and/or her child

is a major aspect of the Section 2511(b) best-interest analysis, it is

nonetheless only one of many factors to be considered by the court when

determining what is in the best interest of the child." ***In re N.A.M.***, 33 A.3d

95, 103 (Pa. Super. 2011) (citation omitted).

The orphans' court issued the following findings as part of the Section

2511(b) analysis:

> Moving to the best interests analysis, the court considered
> several factors including the safety needs of the Children,

the nature of the bond between the Children and Mother, and the relationship between the Children and their Foster Parents. Mother has struggled to provide safety and stability during periods of supervised visitation. Multiple service providers have reported that Mother was unable to properly supervise all three Children together, even with Father's help. Despite a lengthy tenure with a coached parenting program, Mother's parenting abilities have not improved. Additionally, the court is not confident that Mother has been living a substance free lifestyle. She has never been in an appropriate level of treatment and has shown signs of relapse as recent as the Spring of 2022. Substance abuse by one or both parents significantly increase safety concerns for the Children living in the home. Based upon Mother's inability to address her substance abuse concerns and her parenting deficits, the court does not believe that she could adequately provide a safe and stable environment for the Children.

With respect to the bond between Mother and the Children, the court has little evidence to support the notion that one even exists, particularly with [the 22-month-old] L.S. as she does not generally seek Mother out for comfort or support. Dr. Pepe opined that L.S. appears largely indifferent to Mother. The older girls do have a level of comfortability with Mother and do appear to enjoy their visits with her. However, they do not view her as their psychological parent and do not have a primary attachment to her. To the contrary, the Children appear to have a very strong bond with their Foster Parents. Dr. Pepe reported that the Children exhibited multiple bonding behaviors suggestive of primary attachment to the Foster Parents and appeared genuinely happy in their presence. She further opined that the Children would seek them out for assistance and viewed them as psychological parents. The former and current case managers [for a service provider] reported that the Children appeared happy in their foster home. OCYF caseworker, Rick Ogden, reported that the Children were doing "really well" and were bonded with their foster parents. The foster parents have been a great source of support for the Children and have been involved in all their services and activities. The Children have been in their care since October of 2020 and Dr. Pepe opined that [the Children] would be at

- 16 -

significant risk for psychological problems if they were removed from the foster home.

In any termination case, the court must consider the effects of severing the bond between parent and child and whether it is in the child's best interests. In this case, the court finds that the bond between the Children and Mother is not beneficial or necessary and that the Children would not suffer irreparable harm if their relationship with Mother ceased. The court recognizes that there would be likely some [discord] but believes that the Foster Parents could provide the support needed to overcome any negative impact from termination. Dr. Pepe shared a similar sentiment, opining that the Foster Parents' strong bond and commitment to the Children would help to mitigate any issues resulting from the termination of Mother's parental rights. For these reasons, the court found that terminating Mother's parental rights would best suit the developmental, physical and emotional needs and welfare of the Children.

T.C.O. at 13-15 (citations to the record omitted).

On appeal, Mother argues that termination under Section 2511(b) was unfounded. She cites the fact that the Children were excited and happy to see her. Mother also notes that she is appropriate with the Children during the visits. Mother states that she loves the Children, and her involvement adds value to their lives. *See* Mother's Brief at 32-33.

Upon review, we first note that a parent's own feelings of love and affection, alone, do not prevent the termination of parental rights. *Z.P.*, 994 A.2d at 1121. Although the Children are affable during the visits, the same should not be confused with a beneficial or necessary parental bond. Mother's inability to make progress in her reunification plan meant that the Children did not have substantive visits with Mother throughout the dependency proceedings; Mother's visits always remained supervised. That the Children

have done well during the visits is a testament to the Foster Parents' attention to the Children's healthy development. Thus, it comes as no surprise that the Children consider their Foster Parents to be their primary attachments. It was not manifestly unreasonable for the orphans' court to find that relationship between Mother and the Children were too attenuated. For these reasons, we discern no error or abuse of discretion when the orphans' court found that termination would best serve the Children's needs and welfare under Section 2511(b).

In sum, the orphans' court properly concluded that OCYF met its burden by clear and convincing evidence that termination was warranted under Section 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2023